73 N.J. Super. 394 (1962)
180 A.2d 161
JOHN J. STEHR, PLAINTIFF-APPELLANT AND CROSS-RESPONDENT,
v.
ALTON L. SAWYER AND HELEN SAWYER, DEFENDANTS-RESPONDENTS AND CROSS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued March 5, 1962.
Decided March 30, 1962.
*396 Before Judges GOLDMANN, FREUND and FOLEY.
Mr. Sheldon A. Weiss argued the cause for appellant and cross-respondent (Messrs. McGovern & Roseman, attorneys; Mr. Isadore Glauberman, of counsel; Mr. Weiss, on the brief).
*397 Mr. John R. Knox argued the cause for respondents and cross-appellants (Messrs. Morris, Downing & Sherred, attorneys; Mr. Knox, of counsel).
The opinion of the court was delivered by FREUND, J.A.D.
Plaintiff John J. Stehr, the vendee, appeals from a judgment denying him specific performance of a contract to purchase three tracts of real property in the Township of Byram, N.J., either with or without an abatement in the purchase price. The present action was instituted when defendants-vendors, Alton L. Sawyer and Helen, his wife, were unable to perform their contract since they could not deliver good and marketable title to one of those three tracts.
On August 21, 1911 James Frenche at a tax sale purchased a wood lot containing 73 acres assessed to "William Johnson Heirs" for the term of 28 years. The right of anyone in interest to redeem the property was to expire on August 21, 1939. On August 28, 1911, upon payment of $15.29, the amount of the unpaid taxes, interest, costs, fees, charges and expenses, a tax title certificate was issued to him. It was recorded on February 1, 1915 in the Sussex County Clerk's office.
Frenche died intestate on June 2, 1917, and Susan C. Calkins became seized of the lands as his only heir at law. On February 28, 1945 Alton L. Sawyer contracted with Mrs. Calkins, a widow, to purchase by warranty deed the tract in question and two other tracts. These latter two tracts were composed of approximately 82 and 115 acres, respectively, and were described in the contract and in the subsequent conveyance by metes and bounds descriptions. The third tract was described as follows:
"THIRD PARCEL: All the right, title and interest of the party of the first part in and to a tract of wood land containing seventy three acres, at one time assessed to William Johnson Heirs. Being the same purchased by James Frenche for Taxes and for which said James Frenche obtained a tax title certificate from Frank W. *398 Spranger, Collector, dated August 28th, 1911 recorded in said Clerk's Office in Book W-4 of Mortgages pages 137 &c."
An examination of the title was made and an abstract was forwarded to Sawyer. That abstract described the third tract in the same language, as did the contract of purchase by Sawyer.
On July 15, 1950 Mrs. Calkins executed a warranty deed to Alton L. Sawyer for the three tracts of land. It was recorded on September 19, 1950. The description of the third parcel in the last-mentioned deed was the same as in the 1945 contract and abstract. The Sawyers moved from Byram in 1951 and have since resided in Virginia. A tenant farmer has been in possession of the land.
The Sawyer property was first brought to the attention of Stehr in 1959 by Mayor Carl Johnson of Byram. Johnson drove him to the property and generally pointed to its boundary lines. They had with them a map or plotting of the area that had been given to Johnson by a Mr. Pruden, but which Johnson said could not be considered as being accurate. Johnson told Stehr that if he wanted to invest in this property he ought to contact the Sawyers to see if they would sell. Stehr agreed it would be a good investment and suitable for recreation purposes.
Plaintiff's direct testimony indicates that on October 22, 1959 he first telephoned Sawyer, who then resided with his wife in Falls Church, Virginia, and told him of his interest in purchasing the three parcels of land. Sawyer stated that he had not given any serious thought to selling the property but agreed to consider the idea. Plaintiff testified that Sawyer told him that the land measured about 220 acres.
On November 2, 1959 Stehr again telephoned Sawyer at Falls Church and offered $13,500 for the land. Sawyer said that he wanted to offer his tenant farmer the first refusal. Stehr claims he told Sawyer that he did not have a clear picture of the boundary lines of the three *399 parcels. He also claims that Sawyer assured him that he knew the boundaries, had good title to all the lands and there would be no problem in ascertaining all the properties he owned.
A third telephone conversation was had with Sawyer at Falls Church on November 10, 1959. Stehr testified that Sawyer in this telephone conversation accepted his offer of purchase. Plaintiff had by now learned that the land was comprised of three tracts. He was still not sure exactly where the third tract was located and was concerned with defendants' ability to convey good title to it. Sawyer informed him that his attorneys had straightened out all matters of title to his satisfaction when he purchased the land, and assured Stehr that "there was nothing to be concerned of, that there was well over 225 acres." According to plaintiff, the parties then agreed that Stehr would have the contract drafted.
The following day, Armistice Day, was a legal holiday. Nevertheless, plaintiff through his attorney arranged to be admitted to the Sussex County Clerk's office so that they could examine the Calkins-Sawyer deed and other documents relating to the title.
Sawyer had on the same day called Stehr in his absence. Stehr was so informed, whereupon he called Sawyer from his attorney's office. Sawyer told plaintiff he had received an offer of $17,000 for the land and wanted to cancel the negotiations. However, he agreed to allow Stehr to match this offer.
Stehr again spoke to Sawyer by telephone on November 19, 1959 from his attorney's office. He offered $18,000 and Sawyer accepted. Sawyer reassured him that "there would be no question whatsoever about the good title to all, at least 220 acres or so of land and that he would be able to show me just where it was and identify it in the deed that he would contract to convey it." Stehr's attorney prepared the contract at once and on the following day plaintiff saw Sawyer at his home in Falls Church.
*400 Plaintiff had with him the contract, the Pruden plotting and a topographical map of the area of Byram Township. He testified that the Sawyers could not locate the third tract on the map or plotting, nor could they produce any map, plotting or abstract of title of their own to assist in locating it. Stehr then said he would rely on Sawyer's word that he could provide a proper description and would give a warranty deed for the 73-acre tract. He further testified that:
"I told him that * * * my lawyer had advised me to caution him about his position because we hadn't seen no evidence, although, we didn't look any further. I guess, in this deed there was some question in my lawyer's mind also about his title to the seventy-three acres."
Stehr says he informed Sawyer that his attorney had advised him against buying a tax title, and that he was only interested in acquiring good and clear title to all the lands he had agreed to purchase. Plaintiff states that he did not, however, advise defendants as to what the law was since he himself did not know it. The Sawyers then executed the contract agreeing to convey title by a warranty deed to all three tracts. That contract specifically provided:
"It is expressly understood and agreed that the title to the land and premises hereby agreed to be conveyed is not derived from any Martin Act proceedings or any Act for the Sale of Land for non-payment of the municipal taxes or assessments, or adverse or color of title possession."
On cross-examination Stehr admitted that he had examined the Sawyer-Calkins deed at the County Clerk's office before defendants signed the contract. He also had obtained a photostatic copy of the 1950 deed but could not remember whether that was done before or after November 20. Stehr acknowledged seeing in the deed that the third tract "was involved in some sort of tax sale, collector's sale, something to that effect," and that the deed "said something about *401 right, title and interest." Plaintiff denied, however, that his attorney had advised him, before he went to Falls Church to have the contract executed, that the Sawyers' title was unmarketable and that the third tract could not be located. Rather, he said, his attorney had told him that while the deed did not specifically give defendants clear title to the 73-acre tract, it was possible that they had otherwise acquired marketable title. Towards the end of his testimony, when asked if he knew the Sawyers' title was unmarketable at the time his attorney prepared the contract, plaintiff replied, "I was not sure that this was a fact."
Plaintiff's attorney throughout the negotiations with the Sawyers  not his trial attorney  corroborated many aspects of his client's testimony. He stated that by use of his conference telephone he heard Sawyer on November 10 assure plaintiff that he had clear title to the third tract and it could be located. Sawyer had said that a question of title had been raised at the time he contracted to purchase the property, but that "this had been cleared up." Plaintiff's attorney testified that he accompanied his client to the County Clerk's office on November 11 to examine the Sawyer-Calkins deed. He further testified that when he saw the words, "right, title and interest" in the deed it raised "a red flag in my mind that further investigation would have to be done." Nevertheless, he said, his client was convinced by Sawyers' persuasions over the telephone that title was good and that he would see further evidence to that effect once he went to Falls Church.
Alton L. Sawyer's testimony also corroborated many of the details of the precontractual dealings between the parties as represented by Stehr. At the meeting on November 20, however, he claims that he showed plaintiff his deed and an abstract of title and told him that the third tract was acquired by a tax sale certificate. He questioned Stehr about the provision in the contract that the property was not derived from any proceeding growing out of a sale for non-payment of taxes. He said plaintiff responded that "there *402 was nothing in any of them [laws relating to tax sales] that would interfere with the consummation of the transaction," and since "I [Sawyer] had received it by warranty deed I could dispose of it in the same manner."
In addition to Stehr's assurances to Sawyer that there was nothing within "the warranty deed definition that would interfere or cause any repercussions of the sale"  Stehr did not define the meaning of a warranty deed  and that New Jersey law would not interfere with the transaction, Sawyer was of the opinion, from reading his abstract relating to the 28-year redemption provision, that he had good title to the third tract because the original owner's right to redeem had expired. Both Mr. and Mrs. Sawyer claimed that at the meeting of November 20 Stehr was particularly interested in the first two tracts and not seriously interested in the third tract or its location.
Since the rights of the parties were settled once they signed the contract, we can summarize the events that transpired subsequent to November 20. The efforts of Stehr, his attorney and their title searcher to locate the third tract after the contract was executed were unsuccessful. They were also unable to locate the "William Johnson Heirs" to whom the third tract was originally assessed. Plaintiff obtained a copy of the Sawyers' abstract in December 1959 from defendants' attorney but it did not "shed any light on the third tract."
On February 16, 1960 Stehr's attorney wrote to the defendants questioning their right to convey the third tract by a warranty deed, in accordance with the provision of the November 20 contract. On March 29, 1960 Sawyers' attorney wrote to plaintiff's attorney admitting that defendants' title was unmarketable and suggesting that the Sawyers return the down-payment, interest and reasonable search fees.
No settlement was made on the basis of this letter, and the closing was to take place on May 21, 1960, when all the parties were present. Plaintiff's attorney at that time made a formal tender of his client's bond, mortgage and a *403 check for the balance of the purchase price. Defendants' attorney tendered a deed, which plaintiff refused to accept since defendants were unable to convey title to the third tract in accordance with their agreement. The attorney then offered to abate the purchase price by $500 because marketable title to the 73 acres could not be delivered. This, too, was refused as being insufficient in relation to the loss of value represented by the third tract. Finally, defendants' attorney tendered a check for $2,000, which represented Stehr's $1,800 down-payment and $200 towards costs of legal fees and searching expenses, if plaintiff would agree to terminate the contract. Plaintiff would not so agree.
On June 20, 1960 defendants entered into an agreement with Frances J. Schindelar to sell the third tract for more than $18,000. Schindelar was advised of the difficulties and of the possibility that litigation might ensue from the prior contract with Stehr.
Plaintiff by his complaint demanded judgment for specific performance of the November 20 contract with an abatement from the purchase price as compensation for the deficiency in the quantity of land defendants had agreed to convey. Defendants counterclaimed for damages caused by the alleged fraud of plaintiff in inducing them to enter into the contract, and sought to have the contract declared void. The parties stipulated that title to the 73 acres was unmarketable and that the tract could not be located.
At the conclusion of the testimony the court denied specific performance with abatement. Plaintiff then promptly moved for leave to reopen the trial in order to amend the complaint and pretrial order to include a prayer for specific performance without any abatement. The trial judge stated that the issue of specific performance without abatement was "not recognized and actually tried"; plaintiff had already refused an offer to accept what property defendants could convey; the rights of third parties had become involved; and plaintiff "only wanted the property on condition that there was an abatement in the purchase *404 price." The motion was denied and a final judgment was entered denying Stehr specific performance either with or without abatement, dismissing defendants' counterclaim, and ordering them to return to the plaintiff the $1,800 deposit, with interest. Plaintiff then instituted this appeal, and defendants cross-appealed from that part of the judgment requiring them to return the deposit with interest.
Specific performance of a contract to convey realty is a discretionary remedy to be exercised in accordance with equitable principles in view of all the circumstances. Robinson-Shore Development Co. v. Gallagher, 26 N.J. 59, 72 (1958); Gulvin v. Sunshine Park, Inc., 137 N.J. Eq. 249, 253 (E. & A. 1945); Warner v. Giron, 141 N.J. Eq. 493, 495 (Ch. 1948); Ten Eyck v. Manning, 52 N.J. Eq. 47, 49 (Ch. 1893); 4 Pomeroy, Equity Jurisprudence (5th ed. 1941), § 1404, p. 1040; 5 Corbin, Contracts (1951), § 1136, p. 608. In this regard a party may have a right to specific performance when the land has been misdescribed in the conditions of the sale, either as regards its character, its quantity, or its title. Maitland, Equity (2d ed. 1936), pp. 308-9.
Considering first the issue of specific performance with abatement, it is clear that if a dispute develops concerning the sufficiency of the vendor's title and it is determined that the title is defective in some particular, the appropriate remedy, ordinarily, is to compel a conveyance of whatever the vendor has with a proportionate abatement of the purchase price. Robinson-Shore Development Co. v. Gallagher, supra, 26 N.J., at p. 73; Van Blarcom v. Hopkins, 63 N.J. Eq. 466 (Ch. 1902); 5 Williston, Contracts (rev. ed. 1937), § 1436, p. 4012; 3 American Law of Property (1952), § 11.69, pp. 177-8; 2 Restatement, Contracts (1932), § 365. But if the vendee has actual notice that the vendor did not have the ability to convey a complete title, no abatement will be allowed. White v. Weaver, 68 N.J. Eq. 644, 646 (E. & A. 1905); Peeler v. Levy, 26 N.J. Eq. 330, 332 (Ch. 1875). Moreover, *405 even constructive notice can be sufficient ground for failing to invoke the remedy. Abatement may be withheld if the vendee has failed to act as would an honest man of ordinary common sense on the strength of the information received as to the title of the property. Hughes v. Hadley, 96 N.J. Eq. 467, 470-471 (Ch. 1924); Maturi v. Fay, 96 N.J. Eq. 472, 477-478 (Ch. 1924), reversed on other grounds on rehearing 98 N.J. Eq. 377 (E. & A. 1925).
The uncontradicted portions of the evidence established that Stehr had at least constructive notice of a defective title to the third tract, if not actual notice. The trial judge found that plaintiff did in fact know that the title was questionable. That conclusion rested on an evaluation of Stehr's credibility as a witness. Credibility was pre-eminently a question for the trial judge, and since we do not find that his finding lacked reasonable support we will not disturb it. Abeles v. Adams Engineering Co., Inc., 35 N.J. 411, 423-424 (1961); Gallo v. Gallo, 66 N.J. Super. 1, 5-6 (App. Div. 1961).
By November 11, at the latest, Stehr, by his own admission, knew that the Sawyers' title to the third parcel was derived through a tax certificate. Throughout the tenday period intervening before the contract was executed, Stehr was represented by counsel and advised of the dangers inherent in accepting a warranty deed for such property. His attorney frankly confessed that the Sawyer-Calkins deed raised a "red flag." Nevertheless Stehr, whether acting on his own initiative or on Alton L. Sawyer's alleged promises that he and his wife could convey a marketable title, was determined to have the contract executed. The entire import of Stehr's testimony therefore also bespeaks constructive notice of a probably questionable title. Accordingly, the trial judge properly denied specific performance with abatement. Hughes v. Hadley, supra; Maturi v. Fay, supra.
The issue of specific performance without abatement was not, as such, clearly and specifically raised in the *406 complaint, pretrial order or during the trial, aside from a reference in plaintiff's summation. The issue of specific performance was fully tried; the entire factual setting was thoroughly explored. No further proofs were necessary for a determination of whether plaintiff was entitled to specific performance without abatement. That relief, being subsumed under the general heading of specific performance, should have been granted.
We are satisfied from our consideration of the proofs that the Sawyers were in no way prejudiced by plaintiff's failure to pinpoint the precise issue of specific performance without abatement in the pleadings. Further, we conclude that the trial judge erred in giving as a reason for his judgment the fact that the rights of third parties had become involved. Schindelar, the third party, was aware of the probability of litigation and must be deemed to have entered into a contract for the same property but subject to such interest as Stehr might establish. At oral argument it was conceded that the agreement with Schindelar contained a provision that it was subject to the Stehr contract.
Turning to the merits of the claim for specific performance without abatement and recalling that plaintiff had offered to pay the purchase price notwithstanding that he may not obtain the full acreage he originally bargained for, we are satisfied that Stehr is entitled to specific performance without abatement. Fidelity Chemical Products Corp. v. Rubino, 1 N.J. Super. 184, 189 (App. Div. 1949); 49 Am. Jur., Specific Performance, § 102, p. 120; 81 C.J.S. Specific Performance, § 21b, p. 447. Cf. Lafayette Building Corp. v. Tait, 100 N.J. Eq. 73 (Ch. 1926); Hall v. Ely, 91 N.J. Eq. 92 (E. & A. 1919). In Hughes v. Hadley, supra, 96 N.J. Eq., at p. 470, that court stated:
"If, however, the vendee knew of the defect when he made the contract  if he entered into the contract with his eyes open  he has no claim to an abatement from the price, though he may, of course, if he sees fit to accept the land with its defects, and pay the *407 full price, compel a conveyance of whatever the vendor is able to convey."
The refusal by plaintiff to accept defendants' offer to convey their interest in the three tracts plus $500 will not affect his claim for specific performance after a judicial determination that he was not entitled to abatement. The refusal by Stehr to accept this offer did not preclude him from later seeking less than the Sawyers had offered him at the time of the proposed closing of title. Defendants have not demonstrated that they were in any manner prejudiced by this refusal.
The cause is reversed and remanded to the Chancery Division for the purpose of entering a final judgment requiring defendants to convey, without abatement, their right, title and interest in and to the third parcel of land, and, by a warranty deed, their title to the other parcels of land upon payment of the purchase price in accordance with the terms of the contract.